[No. A127979. First Dist., Div. One. Mar. 17, 2011.]

In re A.G., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
A.G., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A., B., and C.

## COUNSEL

Violet Elizabeth Grayson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Eric D. Share and Christina vom Saal, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MARGULIES, Acting P. J.**—Appellant A.G. was alleged in a wardship petition to have committed assault with a deadly weapon and attempted murder. Following a contested jurisdictional hearing, the juvenile court found appellant had committed assault with a deadly weapon and attempted voluntary manslaughter.

At the dispositional hearing, the court, relying on *In re Joseph M.* (2007) 150 Cal.App.4th 889 [58 Cal.Rptr.3d 756] (*Joseph M.*), concluded it lacked the discretion to set a maximum term of confinement any lower than the minimum sentence that might be imposed on an adult for the same offense and set the maximum term of confinement at the mitigated term.

Appellant contends the evidence was insufficient to support the juvenile court's jurisdictional findings and argues the court should have denied the petition on the defense of necessity. Appellant also contends the juvenile

court had the discretion to impose a maximum term of confinement below the mitigated adult term. We reject appellant's first two contentions and affirm the juvenile court's order sustaining the wardship petition. However, we agree the juvenile court was not precluded from setting appellant's maximum term of confinement below the mitigated term. We vacate the court's dispositional order and remand for the court to exercise its discretion in setting the maximum term of confinement.

## I. BACKGROUND

On September 5, 2007, the San Francisco District Attorney filed a wardship petition under Welfare and Institutions Code section 602, subdivision (a), alleging appellant, then age 16, committed attempted murder (Pen. Code, § 664) and assault with a firearm (Pen. Code, § 245, subd. (a)(2)). The petition also alleged appellant was armed with a firearm, personally used a firearm, and caused great bodily injury. (Pen. Code, §§ 12022, subd. (a)(1), 12022.5, subd. (a), 12022.7, subd. (a).) The petition was dismissed without prejudice in March 2008, but it was refiled after appellant was arrested in connection with another shooting later that year.

At the contested jurisdictional hearing, appellant's mother testified that on the morning of August 31, 2007, appellant phoned her in great distress and said he had been robbed at gunpoint. Appellant's mother and father drove to his aid. When they located him near his school, he was sobbing and screaming. After comforting appellant, the family drove off in search of the robbers. Appellant soon spotted a group of four or five men who he claimed had robbed him. Appellant's father stopped the car, allowing appellant and his mother to get out, and then drove off. According to appellant's mother, she walked away with appellant following her. As they walked, she heard three or four gunshots. Eventually, appellant's aunt picked them up and drove them home.

The victim, Ladaris Greer, testifying at the jurisdictional hearing, denied having robbed appellant. He said he was "[h]anging out" with three friends in the Fillmore District that morning when "[s]omebody pulled up [in a car,] talking about a robbery." The driver of the car got out, appearing to carry a gun in his pants, and threatened them. As Greer attempted to escape on foot into a local park, he was cut off by the car. The driver shot him, hitting him twice. Despite being struck in the knee and hip, Greer resumed running, firing his own gun in the direction of the car as he ran. Eventually, the car ran him down.

As Greer lay on the ground, a male got out of the passenger side of the car, walked toward him, and shot him from about eight feet away. As the passenger returned to the car, the driver emerged, yelled to the passenger, "Kill him" or "Shoot the nigga," and then shot Greer himself. While Greer was able to identify the driver as appellant's father, he denied that appellant was the passenger. Greer was otherwise unable to identify the passenger, other than to confirm he was younger than the driver.

Greer's testimony at the hearing conflicted somewhat with his statements to police. San Francisco Police Officer Robert McMillan testified he interviewed Greer in the hospital three days after the shooting. Although Greer was still receiving medical treatment, including morphine for pain, he had been moved from the intensive care unit and was awake and lucid. Greer's account during the interview of the events leading up to his shooting by the passenger was generally consistent with his testimony. Greer told police, however, that after he had been run down by the car, both males got out of the car and walked up to him. The older man said to the younger one, "Shoot him. Shoot the nigger. Shoot him." The younger one kicked Greer and tried to run back to the car, but the older one insisted he shoot Greer. At that point, "the youngster came and he just started shooting, just shooting at anything. He wasn't [unintelligible]. He just started shooting [unintelligible] like, oh, no, 'cause he wasn't hitting—he was just hitting my shoulder. So he was just shooting out of fear . . . ." During the interview, McMillan showed Greer two photo lineups. Greer identified appellant and appellant's father as the persons who shot him. A transcript and recording of the interview were admitted into evidence.

Appellant presented two witnesses from the scene. The first witness saw the encounter from a second floor window, looking only after he heard a car crash and shots fired. He saw three people in the car. The two passengers got out and walked out of his line of sight, then returned to the car, and eventually left the scene on foot. He identified one of the passengers as appellant's father, but he was unable to identify the other. The second witness saw three people, two males and a female, pull up in a car and jump out. The two males ran up the street, and the female drove the car after them. Soon after, he saw the car strike a man, and all three occupants got out. Two of them approached the man on the ground, and one began shooting him. The witness was unable to identify any of the persons involved, but the hairstyles he described were inconsistent with appellant's hairstyle at the time.

Appellant also presented a psychologist who had examined him. The psychologist concluded appellant was "under an intense amount of distress"

after he was robbed, suffering from "acute stress disorder," a short-term version of posttraumatic stress disorder. As a result, at the time of the confrontation with Greer, appellant's "higher level reasoning" was compromised, and his instincts took over.

The juvenile court found true the allegation appellant committed assault with a firearm, but it amended the attempted murder allegation to attempted voluntary manslaughter committed in the heat of passion. In a detailed discussion of the evidence, the court found that Greer's identification of appellant, although given while under medication, was credible and consistent with other evidence. The court concluded appellant was still under the provocative effect of Greer's armed robbery when he shot him, but it found specific intent to kill on the basis of appellant's shooting from close range.

At the dispositional hearing, defense counsel urged the juvenile court to set a maximum term of Division of Juvenile Justice (DJJ) confinement below the mitigated term for an adult offender who has committed the same offenses. The juvenile court declined, relying on *Joseph M., supra,* 150 Cal.App.4th 889, and explained that "because of the facts of this case and because of the law which I find to be governing, the Court is not going to sentence to less than the mitigated term." The court accordingly selected the adult mitigated base term of three years for voluntary manslaughter and reduced it by one-half, to 18 months, because the case involved an attempt. It added an additional consecutive year under Penal Code section 12022, subdivision (a)(1) and struck the remaining enhancements. Appellant was committed to DJJ for a period not to exceed 30 months.

Near the end of the dispositional hearing, appellant's counsel asked the court to run appellant's confinement in DJJ concurrently with a sentence imposed for an unspecified adult offense, presumably the late-2008 shooting. The court assented. The dispositional order stated that "Minor is committed to [DJJ] for a period of time not to exceed 30 months." As an added condition, the order also stated: "This sentence is to run concurrent with Superior Court #2400040. Maximum confinement time is 10 years + 5 months." In the court's subsequent order of commitment to DJJ, appellant's "maximum period of confinement" was listed as "10 years, 5 months." The record contains no explanation of the court's apparently conflicting orders on this issue.

## II. DISCUSSION

A.–C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 791.

## D. *The Dispositional Order*

Appellant raises two issues with respect to the juvenile court's dispositional order. First, appellant contends the court misunderstood the scope of its discretion in holding it could not lawfully set a maximum term of confinement less than the mitigated term. Second, he challenges the court's setting of a maximum term of confinement in excess of 10 years in the commitment order, despite its conclusion at the dispositional hearing that a maximum term of 30 months was appropriate.

### 1. *The Minimum Applicable Adult Sentence*

Appellant contends we should consider the scope of the court's discretion in setting a maximum term of confinement because the court might have set a lower maximum had it believed it had the discretion to do so. While we acknowledge this possibility, there is a further reason we must consider the issue. Although neither party raised the issue, the juvenile court, despite its intentions, actually did set a maximum term of confinement less than the minimum adult sentence.[4]

 Appellant was found to have committed attempted voluntary manslaughter and assault with a deadly weapon. The juvenile court concluded, pursuant to Penal Code section 654, subdivision (a), that an adult would be subject to sentence for only one of these two offenses since, in the words of the statute, appellant's conduct was "punishable in different ways by different provisions of law." (See generally *People v. Vang* (2010) 184 Cal.App.4th 912, 915–916 [109 Cal.Rptr.3d 655].) Under those circumstances, section 654, subdivision (a) directs the court to sentence the offender under the statute providing "the longest potential term of imprisonment." In determining which offense to use in the section 654 calculation, the court chose voluntary manslaughter, with a mitigated term of three years (Pen. Code, § 193, subd. (a)), over assault with a deadly weapon, with a mitigated term of two years (Pen. Code, § 245, subd. (a)(2)). The court then halved the manslaughter term to 18 months to reflect the term for an attempt offense (Pen. Code, § 664, subd. (a)), arriving at a total sentence of 30 months.[5]

Appellant's offense was actually *attempted* voluntary manslaughter, not voluntary manslaughter. These are two different offenses. (*People v. Lewis*

---

[4] Although the prosecution did not object on this ground in the juvenile court and the Attorney General did not raise the issue on appeal, we exercise our discretion to consider this question of law on appeal. (See *In re R.L.* (2009) 170 Cal.App.4th 1339, 1343, fn. 4 [88 Cal.Rptr.3d 854].)

[5] The remaining 12 months resulted from a firearm sentencing enhancement. (Pen. Code, § 12022, subd. (a)(1).)

(1993) 21 Cal.App.4th 243, 251 [25 Cal.Rptr.2d 827].) Accordingly, the court erred in using the manslaughter term for determining the longer sentence under Penal Code section 654. The respective mitigated terms for appellant's offenses were 18 months, for attempted voluntary manslaughter, and two years, for assault with a deadly weapon. Section 654 therefore required the selection of the assault term in determining the sentence for appellant's offenses, resulting in a sentence six months longer than that calculated by the juvenile court.[6]

In addition, the juvenile court struck a sentencing enhancement for infliction of great bodily harm under Penal Code section 12022.7, subdivision (a), reasoning that a section 12022.7 enhancement is "not applicable for manslaughter."[7] Because the court should have selected assault with a deadly weapon as the principal term, there was no basis for striking the section 12022.7 enhancement. (*Id.*, subd. (a); e.g., *People v. Loeun* (1997) 17 Cal.4th 1, 7 [69 Cal.Rptr.2d 776, 947 P.2d 1313].) Adding in the mandatory consecutive three-year enhancement under section 12022.7, subdivision (a), the comparable adult sentence for appellant's offenses was actually six years, rather than 30 months. As a result, the juvenile court unintentionally set a maximum term of confinement substantially less than the minimum adult term of imprisonment for appellant's offenses. As discussed in the next part, we conclude it was within the juvenile court's discretion to set a maximum term of confinement below the adult mitigated term.

### 2. *The Maximum Term of Physical Confinement*

As explained in *In re Jovan B.* (1993) 6 Cal.4th 801 [25 Cal.Rptr.2d 428, 863 P.2d 673] (*Jovan B.*), prior to 1976 the confinement of both adult and juvenile felons was subject to an indeterminate system "which gave courts or administrative agencies broad discretion to set each individual term of confinement on the basis of various factors, including the circumstances of the offense and the offender's progress toward rehabilitation." (*Id.* at pp. 816–817.) In that year, the Legislature enacted the determinate sentencing law (DSL) that continues to govern adult sentencing to this day. Under the DSL, for any particular felony the court must select among one of three sentence terms, according to the particular circumstances of the crime, in

---

[6] Although the Supreme Court originally ruled a court has the discretion to select the lesser sentence under Penal Code section 654 if it determines the corresponding offense to be "the defendant's 'primary objective' " (*People v. Norrell* (1996) 13 Cal.4th 1, 6 [51 Cal.Rptr.2d 429, 913 P.2d 458]), the Legislature abrogated that holding through amendment of section 654. (See *People v. Kramer* (2002) 29 Cal.4th 720, 723–724 [128 Cal.Rptr.2d 407, 59 P.3d 738].)

[7] This was also an error. While the court was correct that Penal Code section 12022.7 does not apply to a conviction of manslaughter (*id.*, subd. (g)), appellant was found to have committed *attempted* voluntary manslaughter. Section 12022.7 does not exempt attempted manslaughter. (*People v. Lewis, supra*, 21 Cal.App.4th at pp. 247–250.)

addition to imposing any fixed-term sentence enhancements. (Pen. Code, §§ 1170, subd. (b), 1170.1, subd. (a).)

In enacting the DSL, the Legislature left unchanged the indeterminate system for juvenile offenders. The same year, however, the Legislature amended the statutes governing juvenile confinement, Welfare and Institutions Code sections 726 and 731, to address a Supreme Court decision holding that equal protection prohibits the confinement of a minor for a period of time longer than the sentence that would be imposed on an adult for an equivalent crime.[8] (*People v. Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375].) As the Supreme Court later explained the effect of these amendments, "In deference to the different purposes of the laws governing adult and juvenile offenders, the Legislature did not create a determinate confinement scheme for juvenile wards like that applicable to adult felons through the [DSL]. However, the 1976 amendments did provide for the first time that any juvenile court order for an offender's physical confinement, or for his commitment to [DJJ], must expressly be limited in duration to the '*maximum term of imprisonment*' (italics added) for an adult convicted of the same offense or offenses." (*Jovan B., supra,* 6 Cal.4th at p. 818.) By amendment of Welfare and Institutions Code section 726 the following year, the Legislature made clear that the "maximum term of imprisonment" is the longest of the triad of determinate sentences plus any proven enhancements. (*Jovan B.,* at p. 818; see Welf. & Inst. Code, § 726, subd. (c).)

In practice, the maximum term of imprisonment rarely determines the actual period of confinement of a ward committed to DJJ. Rather, "[o]nce committed to [DJJ], the minor's actual term is governed by [DJJ] guidelines, within the statutory maximum. 'Minors most often do not serve their maximum terms, but the statutory maximum may affect both parole eligibility and the extent to which actual confinement may be prolonged for disciplinary reasons.' " (*In re Carlos E.* (2005) 127 Cal.App.4th 1529, 1536 [26 Cal.Rptr.3d 551] (*Carlos E.*).)

█ In 2003, Welfare and Institutions Code section 731 was amended again. The provision prohibiting the confinement of a minor for longer than the maximum term of imprisonment was retained, but the following sentence was added immediately following: "A minor committed to the [DJJ] also may not be held in physical confinement for a period of time in excess of the

---

[8] The relevant provision of Welfare and Institutions Code section 726 applies to any ward removed from his or her parents' custody (*id.,* subd. (c)), while the relevant provision of Welfare and Institutions Code section 731 applies only to wards who are committed to DJJ (*id.,* subd. (c)).

maximum term of physical confinement set by the court based upon the facts and circumstances of the matter or matters which brought or continued the minor under the jurisdiction of the juvenile court, which may not exceed the maximum period of adult confinement as determined pursuant to this section." (Stats. 2003, ch. 4, § 1, p. 19; see *Carlos E., supra,* 127 Cal.App.4th at p. 1537.)[9] After considering this amendment's language, circumstances, and limited statutory history, *Carlos E.* explained the amendment's effect as follows: "[T]he juvenile court must determine the maximum period of confinement to [DJJ] based on the facts and circumstances[. T]his maximum may not be more than that for a comparable adult, but may be less. The maximum period of confinement set by the court is not a determinate term, it is the ceiling on the amount of time that a minor may be confined in [DJJ], and recognizes that the committing court has an interest in and particularized knowledge of the minors it commits to [DJJ]. The Youth Authority Board retains the power, subject to the applicable rules and regulations, to determine the actual length of confinement at or below the ceiling set by the juvenile court and to determine the conditions of the minor's confinement. Thus, the indeterminate nature of the system remains in accordance with the distinct purposes of the juvenile system." (*Carlos E.,* at p. 1542.) The Supreme Court has effectively confirmed this reading of the statute, noting in *In re Julian R.* (2009) 47 Cal.4th 487 [97 Cal.Rptr.3d 790, 213 P.3d 125] (*Julian R.*), "Section 731 sets two ceilings on the period of physical confinement to be imposed. The statute permits the juvenile court in its discretion to impose either the equivalent of the 'maximum period of imprisonment that could be imposed upon an adult convicted of the offense or offenses' committed by the juvenile [citation] or some lesser period based on the 'facts and circumstances of the matter or matters that brought or continued' the juvenile under the court's jurisdiction . . . ." (*Id.* at p. 498.)

Subsequent decisions have not challenged the conclusion that Welfare and Institutions Code section 731, subdivision (c) requires the juvenile court to determine a maximum period of confinement independent of the maximum term of imprisonment, but three rulings have explored the interplay between the DSL and the maximum term of confinement for juveniles. In *Joseph M., supra,* 150 Cal.App.4th 889, the decision cited by the juvenile court in making its challenged ruling, the court held that just as the maximum term of imprisonment sets a ceiling on the maximum term of confinement, the minimum term of imprisonment, calculated using the mitigated sentencing term, establishes a floor. Relying primarily on a statement in a Senate

---

[9] As originally enacted, this language was part of subdivision (b) of Welfare and Institutions Code section 731. The subdivision was later redesignated subdivision (c), but its language remains materially the same. (Stats. 2007, ch. 257, § 2.)

committee report evaluating the proposed 2003 amendment, the court concluded the juvenile court lacks discretion to set a maximum term of confinement that is less than the minimum adult sentence for the juvenile's offenses. (*Id.* at pp. 896–897.)

Two subsequent decisions have cast doubt on the holding of *Joseph M.*, although both decisions avoided direct disagreement by distinguishing their circumstances. *In re H.D.* (2009) 174 Cal.App.4th 768 [94 Cal.Rptr.3d 627] (*H.D.*), approved the setting of a maximum term of confinement that did not correspond to any of the three possible DSL sentences. After reviewing the language and history of the 2003 amendment, the court reasoned, "the wholesale importation of the DSL's triadic sentencing scheme into the juvenile court law would be inconsistent with its indeterminate sentencing structure . . ." and concluded, "we find nothing in the legislative history to suggest that the juvenile court's new discretion was intended to be limited to selection of one of the three terms provided by the Penal Code for a particular offense." (*H.D.*, at pp. 776, 777.) Recognizing its holding rested uneasily next to that of *Joseph M.*, the court noted it was not required to render a decision on the specific question decided by *Joseph M.* because there was no indication the juvenile court contemplated a disposition less than the minimum adult sentence. (*H.D.*, at p. 779.)

Soon after, *In re R.O.* (2009) 176 Cal.App.4th 1493 [98 Cal.Rptr.3d 738] (*R.O.*) considered whether the juvenile court has discretion under Welfare and Institutions Code section 731 to set a maximum term of confinement less than the mandatory indeterminate life sentence for first degree murder. In answering affirmatively, the court reasoned straightforwardly, "the plain language of section 731, subdivision (c), which requires the court to consider the 'facts and circumstances of the matter,' explicitly vests in the court discretion to select a period of confinement that is less than the minimum mandatory indeterminate sentence." (*R.O.*, at p. 1498.) The court found its interpretation of the statutory language supported by the legislative history, which suggested the 2003 amendment "arose out of a concern for the Youthful Offender Parole Board's ' "tendency to increase [the] . . . length-of-stay beyond the board's own guidelines, and the board's lack of program expertise." ' " (*R.O.*, at p. 1499.) In addition, *R.O.* noted that its ruling "is consistent with a 150-year tradition of maintaining two separate and distinct criminal justice systems—one for juveniles and one for adults. Describing California's original juvenile justice legislation, our Supreme Court observed: 'The purpose in view is not punishment for offenses done, but reformation and training of the child to habits of industry, with a view to his future usefulness when he shall have been reclaimed to society, or shall have attained his majority.' [Citation.]

Today those same principles are embodied in [Welfare and Institutions Code] section 202 . . . ." (*Id.* at p. 1500, fn. omitted.) While recognizing the similarity of its issue with that in *Joseph M.*, *R.O.* distinguished its decision as involving "indeterminate sentences, not determinate sentences" and noted it was not required to take a position on whether the juvenile court's "discretion in triad cases is limited to imposing the lowest term." (*R.O.*, at p. 1498 & fn. 7.)

■ We cannot avoid *Joseph M.*, but we reach a different conclusion. This is fundamentally an issue of statutory interpretation, and the touchstone for statutory interpretation is the language of the statute. (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1394 [117 Cal.Rptr.3d 377, 241 P.3d 870].) " 'If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls.' " (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1063 [116 Cal.Rptr.3d 530, 239 P.3d 1228].) Only if "the language is susceptible of multiple interpretations . . ." do we resort to " ' "a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " (*Ibid.*)

■ Considering the statutory language, we find it significant, as did *H.D.* and *R.O.*, that Welfare and Institutions Code section 731 as amended makes no reference to the triadic DSL system. As currently configured, section 731, subdivision (c) contains two essentially identical references to the adult sentencing scheme.[10] The first sets an upper limit for the period of physical confinement of a juvenile equal to the maximum term of imprisonment for the juvenile's offense. The second reference, somewhat redundantly, sets the maximum term of imprisonment as the upper limit for the "maximum term of physical confinement" that is to be set by the court. (Welf. & Inst. Code, § 731, subd. (c).) The maximum term of physical confinement is otherwise not constrained by the DSL or the sentencing triad.[11] Instead, it is to be "set by the court based upon the facts and circumstances of the matter or matters that

---

[10] Welfare and Institutions Code section 731, subdivision (c) reads in full: "A ward committed to the [DJJ] may not be held in physical confinement for a period of time in excess of the maximum period of imprisonment that could be imposed upon an adult convicted of the offense or offenses that brought or continued the minor under the jurisdiction of the juvenile court. A ward committed to the [DJJ] also may not be held in physical confinement for a period of time in excess of the maximum term of physical confinement set by the court based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the juvenile court, which may not exceed the maximum period of adult confinement as determined pursuant to this section. This section does not limit the power of the Board of Parole Hearings to retain the ward on parole status for the period permitted by Section 1769."

[11] This does not mean the juvenile court's discretion is unfettered. The DSL sentences can provide guidance, as they did for the juvenile court here, and, as noted in *H.D.*, "the court's

brought or continued the ward under the jurisdiction of the juvenile court." (Welf. & Inst. Code, § 731, subd. (c).) Accordingly, we conclude that under the unambiguous language of subdivision (c), the juvenile court's discretion is not confined by the DSL structure, other than to establish an upper level for the maximum term of physical confinement. The DSL places a ceiling, but not a floor, on the juvenile court's determination of a maximum term of physical confinement under section 731, subdivision (c).

While we need not consult the legislative history, given our reasoning, we note that nothing in that history suggests a different interpretation. Prior to the enactment of the DSL, the juvenile dispositional scheme was indeterminate. When the Legislature elected to make the adult sentencing system determinate, it left the juvenile scheme alone. The adult sentencing system was injected into the juvenile system not by the Legislature but by our Supreme Court, which held that the maximum term of imprisonment puts a constitutional cap on a juvenile's confinement. Only then did the Legislature amend Welfare and Institutions Code sections 726 and 731 to incorporate the DSL, and it was incorporated only to the extent necessary to reflect the Supreme Court's upper limit ruling. If the 2003 amendment was intended to incorporate the DSL into the juvenile dispositional scheme to any greater degree, one would have expected an express indication in the amendment's language. As noted, however, the 2003 amendment did not refer to the DSL as anything other than an upper limit to the maximum term of physical confinement.

■ Further, because the purposes of adult imprisonment and juvenile confinement are entirely different, there is no reason—other than the due process concern long ago identified by the Supreme Court—for the adult sentence and the juvenile term to coincide. While one objective of criminal punishment is the rehabilitation of the offender, the " 'traditional aims' " of imprisonment are deterrence and retribution, as well as the isolation of the offender from society. (*Hudson v. United States* (1997) 522 U.S. 93, 99 [139 L.Ed.2d 450, 118 S.Ct. 488]; see *In re Foss* (1974) 10 Cal.3d 910, 924–925 [112 Cal.Rptr. 649, 519 P.2d 1073], overruled on another ground in *People v. White* (1976) 16 Cal.3d 791, 796–797, fn. 3 [129 Cal.Rptr. 769, 549 P.2d 537].) As a result, the length of a criminal sentence is calculated at least in part with deterrence and retribution in mind. The purposes of the juvenile justice system, on the other hand, are "(1) to serve the 'best interests' of the delinquent ward by providing care, treatment, and guidance to rehabilitate the ward and 'enable him or her to be a law-abiding and productive

discretion . . . is circumscribed by the rules of court, and perhaps by the types of materials listed in Penal Code section 1170.1, subdivision (b) (i.e., probation reports, victim impact statements)." (*H.D., supra*, 174 Cal.App.4th at p. 777.)

member of his or her family and community,' and (2) to 'provide for the protection and safety of the public . . . .' " (*In re Charles G.* (2004) 115 Cal.App.4th 608, 614 [9 Cal.Rptr.3d 503], quoting Welf. & Inst. Code, § 202, subds. (a), (b) & (d).) Deterrence and retribution play no role. As the Supreme Court succinctly put it in *Julian R.,* "Significant differences between the juvenile and adult offender laws underscore their different goals: The former seeks to rehabilitate, while the latter seeks to punish." (*Julian R., supra,* 47 Cal.4th at p. 496.) There is no reason why a minimum sentence designed in part to punish must constrain the limit for a DJJ commitment, given its strictly rehabilitative purpose.[12]

*Joseph M.*'s ruling on this issue did not derive from the statutory language, nor did it follow a finding that the statutory language was ambiguous on this score. Instead, while recognizing Welfare and Institutions Code section 731 vests discretion in the juvenile court to set the maximum term of confinement, *Joseph M.* held the lack of a lower limit on this discretion would not comport with the statutory purpose. (*Joseph M., supra,* 150 Cal.App.4th at p. 895.) In determining this statutory purpose, the court relied only on Welfare and Institutions Code section 726, subdivision (c), which cites the DSL statutes in defining "maximum term of imprisonment," and to a Senate committee report written during the consideration of the 2003 amendment. The report stated: " ' "This bill would authorize the court to additionally set maximum terms of physical confinement in the [DJJ] based upon the facts and circumstances of the matter or matters which brought or continued the minor under the jurisdiction of the juvenile court. This new provision would provide for court consideration of factors about the offense and the offender's history which would be comparable to those employed now for the triad sentencing of adults, and have those considerations reflected in the [DJJ] confinement term ordered by the court." ' " (*Joseph M.,* at p. 896, italics omitted.) Based on these items, *Joseph M.* concluded: "The legislative intent is clear. The amendment to section 731, subdivision [(c)] was intended to afford the juvenile court the discretion to consider the facts and circumstances of the minor's case in setting a period of physical confinement that was less than the maximum adult term but within the sentencing triad described in Penal Code section 1170, subdivision (a)(3)." (*Id.* at pp. 896–897.)

Unlike *Joseph M.,* we see no clear legislative intent emerging from either Welfare and Institutions Code section 726, subdivision (c) or the quoted committee report. Section 726, subdivision (c) reiterates what is clear from

---

[12] In addition, while the length of an adult's incarceration is determined in large part by the court's sentence, the length of a juvenile's commitment is determined by DJJ, independent of the juvenile court's maximum term of confinement. The maximum term serves only as an upper limit on DJJ's custody. (See *Jovan B., supra,* 6 Cal.4th 801, 811, and regulations cited therein.)

Welfare and Institutions Code section 731 itself: that the DSL sets an upper limit for the juvenile's term of confinement. It suggests nothing more.[13] The significant language from the committee report, that the amendment " ' "would provide for court consideration of factors about the offense and the offender's history which would be comparable to those employed now for the triad sentencing of adults" ' " (*Joseph M., supra*, 150 Cal.App.4th at p. 896, italics omitted), merely analogizes the anticipated exercise of discretion by the juvenile court to a trial court's exercise of discretion in selecting among the triad of sentences under the DSL. Even if this were binding statutory language, rather than an anonymous expression of legislative committee opinion, it would not constitute a clear indication that the DSL was intended to confine the setting of maximum terms of physical confinement under Welfare and Institutions Code section 731.[14]

■ Accordingly, we agree with *R.O.* that Welfare and Institutions Code section 731, subdivision (c) does not incorporate the minimum term of adult imprisonment as a lower limit on the juvenile court's setting of a maximum term of physical confinement. The juvenile court did not err in setting appellant's maximum term of confinement below the minimum adult sentence, even if it did so inadvertently. Nonetheless, for the reasons stated in the next part, we shall remand this matter for setting of the maximum term of confinement.

### 3. *The Ambiguity in the Dispositional Order*

As noted above, the juvenile court set 30 months as appellant's maximum term of physical confinement at the dispositional hearing. The dispositional order, while listing this maximum term, also contained a handwritten added condition stating: "This sentence is to run concurrent with Superior Court #2400040. Maximum confinement time is 10 years + 5 months." In an order

---

[13] The court quoted the following language from Welfare and Institutions Code section 726, subdivision (c): " '*As used in this section and in Section 731*, "maximum term of imprisonment" means the longest of the three time periods set forth in paragraph (2) of subdivision (a) of Section 1170 of the Penal Code, but without the need to follow the provisions of subdivision (b) of Section 1170 of the Penal Code or to consider time for good behavior or participation pursuant to Sections 2930, 2931, and 2932 of the Penal Code, *plus enhancements which must be proven if pled.*' " (*Joseph M., supra*,150 Cal.App.4th at p. 896, italics added by *Joseph M.*)

[14] In any event, committee reports are not necessarily reliable guides to the Legislature's intent. As our Supreme Court cautioned recently, quoting the United States Supreme Court, " 'judicial reliance on legislative materials like committee reports . . . may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text.' " (*Martinez v. Regents of University of California* (2010) 50 Cal.4th 1277, 1293 [117 Cal.Rptr.3d 359, 241 P.3d 855].)

signed four days later, entitled, "Clarification of Sentencing," the court wrote, under a line item entitled "Other Orders," "Maximum confinement to run concurrent is 10.5 years." Finally, in the court's commitment order, the "maximum period of confinement" is listed as "10 years, 5 months."

 Appellant rightly contends the juvenile court's orders are inconsistent. The Attorney General unhelpfully denies any inconsistency, insisting "[a]ppellant has confused the imposition of the [maximum term of physical confinement] with the recommended period of confinement at DJJ." The term "recommended period of confinement at DJJ," however, has no legal meaning. As explained at length above, the juvenile court's job is to set the maximum period for which a juvenile can be confined under Welfare and Institutions Code section 731, subdivision (c). There is no provision for the juvenile court to make a "recommendation" about the actual period of confinement, which is determined by DJJ guidelines. (See *Carlos E.*, *supra*, 127 Cal.App.4th at p. 1536.) Further, the juvenile court made no mention of a "recommendation" at the dispositional hearing, plainly stating: "The minor is committed to the [DJJ] for the term prescribed by law, and as I indicated in this case, it would be not to exceed 30 months."

There is no explanation in the record for the inconsistency. Our best guess is that appellant's sentence in the criminal case has been clerically transformed, over the course of three written orders, to the maximum term of confinement in this matter, but we decline to speculate as to the juvenile court's intent. In light of the confusion between the court's initial dispositional order and the commitment order and the court's mistaken assumption regarding the scope of its discretion in setting the maximum term of confinement, we believe it appropriate to vacate the dispositional order and remand to allow the juvenile court to reconsider appellant's maximum term of confinement. In doing so, we do not mean to express any opinion as to the appropriate maximum term of confinement for appellant.[15]

## III. DISPOSITION

The juvenile court's dispositional and commitment orders are vacated. The matter is remanded to the juvenile court with directions to set a maximum period of physical confinement consistent with this decision, to prepare an

---

[15] Appellant contends double jeopardy precludes the juvenile court from setting a maximum term of confinement greater than 30 months on remand because the term, although "fashion[ed] . . . in an unauthorized manner" was not "illegal," quoting *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1311–1312 [28 Cal.Rptr.2d 172]. We note the record is unclear as to exactly what maximum term of confinement the court intended to set and decline to rule in advance whether double jeopardy concerns are triggered by the setting of a maximum term of DJJ confinement.

amended commitment order reflecting any changes, and to forward a certified copy of the amended commitment order to the Department of Corrections and Rehabilitation, Division of Juvenile Justice. Except as stated, the judgment of the juvenile court is affirmed.

Dondero, J., and Banke, J., concurred.