Filed 2/6/23 In re D.C. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| IN RE D.C., a Person Coming Under the Juvenile Court Law. | H049939 (Santa Clara County Super. Ct. No. 15JV41206B) |
| THE PEOPLE, Plaintiff and Respondent, v. D.C., Defendant and Appellant. | |

D.C. appeals from the denial of his Welfare and Institutions Code section 779[1] petition requesting that the juvenile court set aside his commitment to the Division of Juvenile Justice (DJJ).  The juvenile court denied the petition after concluding that D.C. was committed to the DJJ pursuant to a negotiated plea agreement, which it could not change without the parties' consent.  D.C. argues that the juvenile court erred when it declined to consider his petition on the merits because the parties' agreement did not preclude the court from exercising its authority under section 779.  We agree and reverse the juvenile court's order.

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

## I.  BACKGROUND

### A.  *The Section 602 Petition and the Negotiated Plea Agreement*

On June 27, 2019, the Santa Clara County District Attorney filed a juvenile wardship petition under section 602, subdivision (a), alleging that D.C. came within the juvenile court's jurisdiction for committing four counts of lewd and lascivious acts by force against a child under the age of 14.  (Pen. Code, § 288, subd. (b)(1).)[2]  That same day, the People filed a motion requesting that D.C.'s case be transferred to a court of criminal jurisdiction under section 707, subdivision (a)(1), followed later by a written motion disputing the constitutionality of Senate Bill No. 1391.

On August 30, 2019, in lieu of setting a transfer hearing, the parties represented to the juvenile court that they had reached an agreement.  The prosecutor stated that the parties had agreed that D.C., having previously admitted the four substantive counts in criminal court, would further admit as to count 2 that he was 16 years old at the time of the offense so that count 2 could be used as a strike against him should he commit future offenses as an adult.  The prosecutor also stated that she "agree[d] with the defense that

---

[2] This is the second section 602, subdivision (a) petition filed against D.C. arising from the same operative facts.  In 2015, on the first petition alleging 10 counts of violating Penal Code section 288, subdivision (b)(1), the juvenile court transferred the case to criminal court.  Prior to the passage of Proposition 57, D.C. pleaded guilty to four counts in exchange for a 40-year sentence.  In 2019, this court concluded that the criminal court erred in not transferring the case back to juvenile court for a post-Proposition 57 transfer hearing, vacated the judgment, and ordered all counts of conviction transferred to the juvenile court.  In part, we conditionally reversed two of the four convictions.  We held that if those convictions were transferred back to adult criminal court, the adult criminal court would be required to resentence D.C. on those counts and would be unable to vacate the plea agreement, but if the juvenile court declined to transfer those two convictions, the juvenile court should treat those convictions as juvenile adjudications.  As for the remaining two convictions, we concluded that the juvenile court should treat the convictions as juvenile adjudications and impose an appropriate disposition after a dispositional hearing.

the minor will be committed to DJJ for a period of rehabilitation" and asked the juvenile court to "set 731(c) time at 30 years to ensure that DJJ understands that [D.C.] may be held until he is 25[]years[]old and to express to DJJ the People's belief that he should be held until he is 25 years old." The prosecutor also agreed to withdraw the motion to transfer the case to criminal court. Defense counsel confirmed the prosecutor's recitation of the plea agreement. D.C. thereafter admitted that he was 16 years old at the time of count 2.

At the dispositional hearing in September 2019, the juvenile court stated that it was going to commit D.C. to the DJJ "specifically for sex offender rehabilitation." The juvenile court also stated that it was "going to follow the recommendations of the probation department and sentence [D.C.] to the Department of Juvenile Justice and that would be a 30-year commitment which tells them that he must stay until he's at left [*sic*] 25 where he will be released at that time." Defense counsel requested: "[G]iven that [D.C.'s] going to be [in] DJJ for the four years [(until he reached age 25)] that the Court consider not imposing the fines and fees that are discretionary." Attached to the minute order after the sentencing hearing was the probation report's recommendations, which included the recommendation that D.C. "be committed to the California Department of Corrections and Rehabilitation-Division of Juvenile Justice for further care, training, and treatment pending acceptance by the California Department of Corrections and Rehabilitation."

## B.    *D.C.'s Section 779 Petition*

On February 7, 2022, D.C. petitioned the juvenile court to modify or set aside his DJJ commitment under section 779, which authorizes the juvenile court to set aside or modify a DJJ commitment " 'upon a showing of good cause that the Youth Authority is

3

unable to, or failing to, provide treatment consistent with Section 734.' "[3] (§ 779.) D.C. argued that he had commenced an 18-to-24-month sexual behavioral treatment program 23 months earlier and had "excel[l]ed and flourished" at the DJJ.

The People opposed D.C.'s petition, both on the merits and on the ground that the parties' negotiated plea bargain did not permit D.C. to ask the juvenile court to modify his DJJ disposition.

The juvenile court heard argument on the petition in February 2022 and issued a written statement of decision the following April denying the petition. The juvenile court determined that, in exchange for the People's withdrawal of the transfer request to adult criminal court, D.C. had agreed to be committed to the DJJ until he turned 25 years old in August 2023. The juvenile court determined: "[A]ll parties understood that this was a commitment to DJJ and that the commitment was through [D.C.'s] 25th birthday. At the same time, all parties had to know that the DJJ parole board routinely releases young people a few months before the 25th birthday. Therefore, the parties implicitly agreed to leave [D.C.'s] release date up to the DJJ parole board." The juvenile court thereafter concluded that it did not have "the power or that it ought to change the plea bargain agreement" entered between the parties.

## II. DISCUSSION

### A. *Terms of the Plea Agreement*

D.C. argues that the juvenile court erroneously interpreted his plea agreement by concluding that the agreement stripped the court of its authority to modify his DJJ commitment pursuant to section 779. We agree that nothing in the plea agreement

---

[3] In 2005, the correctional agency formerly known as the Youth Authority became known as the Division of Juvenile Facilities, part of the Division of Juvenile Justice, under the Department of Corrections and Rehabilitation. (*In re D.J.* (2010) 185 Cal.App.4th 278, 280, fn. 1.)

4

restricted D.C. from filing a section 779 petition or precluded the juvenile court from considering such a petition. The juvenile court therefore erred by declining to reach the merits of D.C.'s petition.

### 1. *Legal Principles*

At the time that D.C. was sentenced, section 607, subdivision (b) provided that "[t]he [juvenile] court may retain jurisdiction over a person who is found to be a person described in Section 602 by reason of a commission of an offense listed in subdivision (b) of Section 707, until that person attains 25 years of age if the person was committed to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities." (Former § 607, subd. (b); Stats. 2018, ch. 36, § 30.) Under section 731, when the juvenile court commits a ward to the DJJ, it can also "set an earlier outside limit to the indeterminate period of commitment." (*In re Sean W.* (2005) 127 Cal.App.4th 1177, 1188 (*Sean W.*); § 731.)

At the time of D.C.'s sentencing hearing, former section 731, subdivision (c) stated: "A ward committed to the Division of Juvenile Justice shall not be confined in excess of the term of confinement set by the committing court. The court shall set a maximum term based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the court and as deemed appropriate to achieve rehabilitation. The court shall not commit a ward to the Division of Juvenile Justice for a period that exceeds the maximum term of imprisonment that could be imposed upon an adult convicted of the same offense. This subdivision does not limit the power of the Board of Juvenile Hearings to discharge a ward committed to the Division of Juvenile Justice pursuant to Sections 1719 and 1769." (Stats. 2018, ch. 766, § 1.)[4]

---

[4] Section 731 has since been amended, effective July 1, 2021. Under the newly amended version of section 731, the juvenile court now "shall not" set a maximum term

5

Within the limits of sections 607 and 731, however, a minor's *actual* period of commitment to the DJJ is determined by DJJ guidelines. (*In re Carlos E.* (2005) 127 Cal.App.4th 1529, 1536 (*Carlos E.*).) Section 1719, subdivision (b) provides that the Board of Juvenile Hearings has the power and duty to discharge ward's commitment, and subdivision (c) provides that the DJJ has the power and duty to "set[] . . . discharge consideration dates" for wards in its custody. In other words, the minor's actual length of stay is based on the DJJ and the Board of Juvenile Hearing's administrative decisions. (*Sean W.*, *supra*, 127 Cal.App.4th at p. 1188.)

Accordingly, "[i]n practice, the maximum term of imprisonment rarely determines the actual period of confinement of a ward committed to the DJJ. Rather, '[o]nce committed to [DJJ], the minor's actual term is governed by [DJJ] guidelines, within the statutory maximum. "Minors most often do not serve their maximum terms, but the statutory maximum may affect both parole eligibility and the extent to which actual confinement maybe prolonged for disciplinary reasons." ' " (*In re A.G.* (2011) 193 Cal.App.4th 791, 800 (*A.G.*).) In fact, "[t]here is no [statutory] provision for the juvenile court to make a 'recommendation' about the actual period of confinement." (*Ibid.*)

Here, the juvenile court committed D.C. to the DJJ based on a negotiated plea agreement. "[A] negotiated plea agreement is a form of contract and is interpreted according to general contract principles." (*Doe v. Harris* (2013) 57 Cal.4th 64, 69.) " 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Citation.] If contractual language is clear and explicit, it governs. [Citation.] On the other hand, "[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promise understood it." ' " (*People v. Shelton*

---

of confinement "that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense." (§ 731, subd. (b); Stats. 2021, ch. 18, § 8.)

(2006) 37 Cal.4th 759, 767 (*Shelton*).) " 'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations]' " (*Ibid.*)

" '[I]nterpretations of [a plea agreement] contract must be based on an objective standard in which [the defendant's] "reasonable beliefs" control. [Citations.]' [Citation.] '[P]lea agreements are interpreted according to the general rule "that ambiguities are construed in favor of the defendant. Focusing on the *defendant's* reasonable understanding also reflects the proper constitutional focus on what induced the *defendant* to plead guilty." [Citation.]' " (*In re Timothy N.* (2013) 216 Cal.App.4th 725, 734 (*Timothy N.*).)

" '[T]he "interpretation of a contract is subject to de novo review where the interpretation does not turn on the credibility of extrinsic evidence." [Citations.]' " (*In re Ricardo C.* (2013) 220 Cal.App.4th 688, 696.) However, if there is admissible competing parole evidence that requires the resolution of credibility issues, the substantial evidence test applies. (*People v. Paredes* (2008) 160 Cal.App.4th 496, 507.)

2.    *Analysis*

The first step of our analysis is to determine whether there is any ambiguity in the terms of the plea agreement. Here, there was no written plea agreement; the terms of the plea agreement were orally recited by the prosecutor before the juvenile court at the August hearing. The prosecutor stated that the parties had "agree[d] . . . that the minor will be committed to DJJ for a period of rehabilitation." Neither party represented to the court that the agreement included a minimum commitment term or a waiver of any available statutory vehicle for early release.

7

Although the parties did not define what a "period of rehabilitation" entails, such an omission did not render the plea agreement ambiguous. Such specificity would likely have been impossible to achieve, as the juvenile court cannot set the minor's actual term of confinement—the juvenile court can only set the maximum term under section 731, and the minor's actual term of confinement is limited by DJJ guidelines, within the statutory maximum set forth in section 607. (*Carlos E.*, *supra*, 127 Cal.App.4th at p. 1536.)

Based on the foregoing, we find the terms of the plea agreement to be clear and unambiguous: the parties agreed that D.C. would be committed to the DJJ "for a period of rehabilitation." At no point did the parties agree to restrict D.C.'s ability to petition the juvenile court to modify his commitment under section 779, nor did the parties contemplate a provision that precluded the juvenile court from considering such a petition. We must presume that the parties were aware of all applicable laws when the plea agreement was entered, which would have included the juvenile court's authority to consider and rule upon a petition filed under section 779. (See *Swenson v. File* (1970) 3 Cal.3d 389, 393 [parties presumed to know and have in mind all applicable laws when an agreement is made].) And here, waiver of statutory rights must be " ' "a voluntary and intelligent choice." ' " (*People v. Mosby* (2004) 33 Cal.4th 353, 361 [waiver of statutory right to jury trial must be knowing and voluntary].) Moreover, we generally " ' "cannot insert in the contract language which one of the parties now wishes were there." ' " (*People v. Rabanales* (2008) 168 Cal.App.4th 494, 504.) A contract term can only be implied " ' "upon grounds of obvious necessity," ' " and a term restricting the juvenile court from considering a section 779 petition is not a necessity in this case. (*Ibid.*)

The juvenile court implicitly found there to be ambiguity in the plea agreement, relying on extrinsic evidence as establishing an agreement that D.C. would be committed until his 25th birthday, subject only to the DJJ's guidelines. As we find the plea

8

agreement to be clear and unambiguous, we need not resort to looking at extrinsic sources. (*Shelton*, *supra*, 37 Cal.4th at p. 767.) However, even if we treat the plea agreement as ambiguous, extrinsic evidence does not support the juvenile court's conclusion that the parties had agreed that the juvenile court could not modify or set aside the commitment under section 779.

When interpreting the terms of the plea agreement, we must focus on the parties' mutual intent at the time the agreement was entered: " 'The fundamental rule is that interpretation of . . . any contract . . . is governed by the mutual intent of the parties at the time they form the contract.' " (*Nelsen v. Legacy Partners Residential, Inc.* (2012) 207 Cal.App.4th 1115, 1129.) The parties' statements at the dispositional hearing demonstrate only a mutual intent that D.C. be committed to the DJJ. At the hearing, the prosecutor requested that the juvenile court "set the 731(c) time"—the maximum term of confinement—at 30 years— so that "DJJ understands that he *may* be held until he is 25[]years[]old and to express to DJJ *the People's belief* that he should be held until he is 25 years old." (Italics added.) The prosecutor's statement does *not* reflect that the parties agreed that D.C. would in fact serve a specified term of confinement at DJJ—the statement conveyed that the prosecutor wanted the juvenile court to set an outer limit of 30 years under former section 731, subdivision (c) to convey to the DJJ the People's view that D.C. *should* remain in DJJ custody until he reached 25 years of age. Nothing in the parties' agreement or statements purports to usurp the DJJ's authority to determine D.C.'s actual term of confinement, nor did the parties expressly agree to a minimum term of confinement.

The Attorney General nonetheless argues that some of the prosecutor's unchallenged statements at the August hearing and the parties' subsequent conduct reflect an agreement to a 30-year commitment term. This argument, however, is in conflict with both the function of the section 731 term where it exceeds the section 607 jurisdictional

limit and also the record, which reflects the parties' understanding that D.C., then 21, would be released at the latest at age 25. First, as to the August hearing, the Attorney General relies on the absence of objection by D.C.'s counsel to the prosecutor's requested maximum term under section 731. We note that the prosecutor characterized the section 731 term as the People's request, as opposed to the parties' agreement. And the prosecutor's earlier statement that it was "*the People's* belief" (italics added) that D.C. should remain confined with the DJJ until he was 25 years old appears to reflect the prosecutor's understanding that a minimum term was not a negotiated term of the plea agreement. Moreover, even assuming that the requested section 731 term were a part of the parties' agreement, we fail to see how an agreement as to the maximum term of confinement under former section 731, subdivision (c) demonstrates that the parties mutually intended that D.C. would actually remain committed for the maximum term.[5]

The Attorney General also relies on the express assent by D.C.'s counsel at the September dispositional hearing to the prosecutor's representation that "we're going to set 731(c) time at 30 years, but the actual maximum confinement time is 40 years." But we note that the context of this remark was in correcting the probation report, which had mistakenly represented that the maximum term of confinement was 30 years. At the August hearing, the prosecutor had explained that her request for a section 731 maximum term of 30 years was to avoid having "to address credits for purposes of DJJ," when the "statutory time" applicable to an adult convicted of the same offenses "is 40" years.

Next, the Attorney General argues that defense counsel requested at the sentencing hearing that the juvenile court not impose certain discretionary fines and fees because

---

[5] Under the law in effect at the time of the dispositional hearing, juvenile wards could not be confined for a period longer than that the maximum term applicable to an adult criminal defendant convicted of the same charges. (Former § 731, subd. (c), Stats. 2018, ch. 766, § 1.)

D.C. was "going to be [in] DJJ for the four years," demonstrating an understanding that D.C. would be at the DJJ for a 30-year commitment. Presumably, defense counsel was aware that once committed to the DJJ, D.C.'s actual term of confinement would be determined by DJJ guidelines, within the maximum confinement age of 25. Thus, an equally reasonable interpretation of defense counsel's statement is that she was referring to the fact that D.C. could be confined for a *maximum* of four years—and would likely remain in the DJJ until he neared age 25—so she was requesting that his fines and fees be waived.[6] Any ambiguity should be construed in D.C.'s favor. (*Timothy N.*, *supra*, 216 Cal.App.4th at p. 734.) And even if defense counsel's statement can be construed as her understanding that D.C. would presumptively remain in DJJ until age 25, her statement is nonetheless silent on whether D.C. could file a petition under section 779. Defense counsel's after-the-fact request that fines and fees should be waived is also not dispositive of what D.C. understood the terms of the plea agreement to be at the time it was made. (*Shelton*, *supra*, 37 Cal.4th at p. 767.)

As noted by the Attorney General, D.C. did not object when the juvenile court stated at the dispositional hearing that the 30-year maximum term of confinement "tells [DJJ] that [D.C.] must stay until he's at left [*sic*] 25 where he will be released at that time."[7] But the court's statement does not convey that the parties stipulated to a specific term of actual commitment, when "[t]here is no [statutory] provision for the juvenile court to make a 'recommendation' about the actual period of confinement." (*A.G.*, *supra*,

---

[6] Moreover, D.C. will turn 25 years old in August 2023. Thus, even if the juvenile court had modified his DJJ commitment, D.C. would not have been far off from his 25th birthday.

[7] Notably, the juvenile court also specified at the sentencing hearing that it intended to commit D.C. to the DJJ "specifically for sex offender rehabilitation" without referencing a specific time frame.

193 Cal.App.4th at p. 807.) [8] Rather, the only lawful interpretation of the juvenile court's statement is that the court understood by its section 731 finding that section 607's jurisdictional maximum of age 25 would control: D.C. would be released at the *latest* when he is 25 years old. And importantly, the juvenile court's statement does not purport to preclude the juvenile court from considering a section 779 petition.

Accordingly, we conclude that the juvenile court erred when it found that it lacked the authority to consider D.C.'s section 779 petition absent the People's consent, as filing a section 779 petition was not precluded by the plea agreement.

**B.      *Section 779***

Alternatively, the Attorney General argues that even if the plea agreement did not prevent the juvenile court from modifying D.C.'s DJJ commitment, the court was still precluded from doing so because it lacked the authority to determine when D.C. should be released. Relying on *In re Owen E.* (1979) 23 Cal.3d 398 (*Owen E.*), the Attorney General claims that D.C.'s discharge is solely within the purview of the DJJ and the juvenile cannot intervene unless the DJJ has failed to comply with the law or has abused its discretion in dealing with D.C. The Attorney General's argument, however, fails to account for the amendment made to section 779 in the more than 40 years since *Owen E.*

*Owen E.*, decided 1979, contemplated the juvenile court's ability to vacate a juvenile's commitment to what was then the Youth Authority. (*Owen E.*, *supra*, 23 Cal.3d at pp. 402-403.) At the time, section 779 provided in pertinent part that: "the court shall give due consideration to the effect thereof upon the discipline and parole system of the Youth Authority or of the correctional school in which the ward may have been placed by the Youth Authority. Except in this section provided, nothing in this

_____

[8] As the juvenile court was without authority to specify D.C.'s actual term of confinement to the DJJ, if such a term were a part of the plea agreement, it would be unenforceable. (See *People v. Brown* (2007) 147 Cal.App.4th 1213, 1224-1225 [specific performance is not available remedy if negotiated sentence is unauthorized].)

12

chapter shall be deemed to interfere with the system of parole and discharge now or hereafter established by law, or by rule of the Youth Authority, for the parole and discharge of wards of the juvenile court committed to the Youth authority, or with the management of any school, institution, or facility under the jurisdiction of the Youth Authority . . . ." (Former § 779; Stats. 1961, ch. 1616, p. 3492, § 2; *Owen E.*, *supra*, p. 401, fn. 3.)

Based on the foregoing language, the *Owen E.* court concluded that section 779 "does not constitute authority for a juvenile court to set aside an order committing a ward to CYA merely because the court's view of the rehabilitative progress and continuing needs of the ward differ from CYA determinations on such matters arrived at in accordance with law." (*Owen E.*, *supra*, 23 Cal.3d at p. 405.) Thus, *Owen E.* held that "a juvenile court may not act to vacate a proper commitment to CYA unless it appears CYA has failed to comply with law or has abused its discretion in dealing with a ward in its custody. Section 779 does not authorize judicial intervention into the routine parole function of CYA." (*Ibid.*)

In 2003, however, the Legislature amended section 779 to add: "This section does not limit the authority of the court to change, modify, or set aside an order of commitment after a noticed hearing and upon a showing of good cause that the Youth Authority is unable to, or failing to, provide treatment consistent with Section 734." (Stats. 2003, ch. 4, § 2 (Sen. Bill No. 459).) Section 734 provides that "[n]o ward of the juvenile court shall be committed to the Youth Authority unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by the Youth Authority."

In sum, under the current version of section 779, the juvenile court is vested with the authority to modify a ward's commitment to DJJ *if* it finds that the DJJ is unable to

13

provide treatment consistent with section 734. Thus, *Owen E.*'s holding no longer fully describes the juvenile court's authority to modify or vacate a ward's commitment.

Here, D.C. argued below in his section 779 petition that he should be released from the DJJ because the DJJ's "juvenile justice goals of rehabilitation and community safety" would no longer be served by his continued commitment. D.C. also specifically cited to the juvenile court's authority to vacate his commitment if it found that the DJJ was unable to or failing to provide treatment consistent with section 734. However, the juvenile court in this case declined to reach the merits of D.C.'s arguments because it operated under the assumption that it lacked the authority to change D.C.'s plea bargain. As the juvenile court failed to consider the merits of D.C.'s petition, we conclude that the appropriate remedy is to remand the matter so that it may consider whether to grant D.C.'s section 779 petition in the first instance. (See, e.g., *People v. McLernon* (2009) 174 Cal.App.4th 569, 577 [proper remedy when trial court failed to consider merits of defendant's motion to expunge record is to remand the matter for the trial court to determine whether relief is warranted]; see also *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [remand required if trial court was unaware of scope of discretionary powers unless record clearly indicates that the same conclusion would have been reached].) In so doing, we express no opinion on how the juvenile court should exercise its discretion on remand.

### III. DISPOSITION

The juvenile court's order denying D.C.'s section 799 petition is reversed. On remand, the juvenile court is directed to consider the petition on the merits.

14

_____
LIE, J.

WE CONCUR:



_____
GREENWOOD, P.J.




_____
GROVER, J.




*People v. D.C.*
H049939